John Burton, State Bar No. 86029
jb@johnburtonlaw.com
THE LAW OFFICES OF JOHN BURTON
128 North Fair Oaks Avenue
Pasadena, California  91103
Telephone:   (626) 449-8300
Facsimile:    (626) 449-8197

Attorneys for Plaintiff Terence B. Tekoh

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERENCE B. TEKOH,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>COUNTY OF LOS ANGELES, LOS ANGELES SHERIFF'S DEPARTMENT, SGT. DENNIS STANGELAND, DEPUTY CARLOS VEGA, and DOES 1 to 10,<br><br>　　　　Defendants. | Case No.  16-cv-7297<br><br>**COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS UNDER COLOR OF STATE LAW**<br><br>**DEMAND FOR JURY TRIAL** |

## JURISDICTION AND VENUE

　　1.　　This case arises under 42 U.S.C. § 1983. Accordingly, subject matter jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343.

　　2.　　Plaintiff's claims arise out of a course of conduct involving officials of the County of Los Angeles, in the County of Los Angeles, State of California, and within this judicial district.

**PARTIES**

3. Plaintiff Terence B. Tekoh is an adult competent to prosecute an action on his own behalf. He is an immigrant from Cameroon with a green card residing lawfully in the United States. He intends to become a naturalized citizen.

4. Defendant County of Los Angeles is a legal and political entity established under the laws of the State of California, with all the powers specified and necessarily implied by the Constitution and laws of the State of California and exercised by a duly elected Board of Supervisors and Sheriff, and their agents and officers. Defendant Los Angeles Sheriff's Department (LASD) is a public agency subject to suit.

5. At relevant times, Defendant Dennis Stangeland was an LASD sergeant and Defendant Carlos Vega an LASD deputy. In committing the acts alleged, each acted within the scope of his respective employment and under color of state law.

6. The true names of defendants Does 1 through 10 are presently unknown to Plaintiff, who therefore sues each by such fictitious name; but upon ascertaining the true identity of a defendant Doe, Plaintiff will amend this Complaint or seek leave to do so by inserting the true name in lieu of the fictitious name.

7. All defendants acted in concert, within the scope of their respective employments and agencies, and under color of California law. Each had the duty and the opportunity to intervene to prevent the others from depriving Plaintiff of his constitutional rights and chose not to do so.

**FACTS**

8. At the time of the incident underlying this complaint, Plaintiff Terence Tekoh was 25 years old, a certified nurse assistant (CNA) employed by Cross Country Per Diem, a medical workers' registry. For about two years, from 2012 to 2014, was assigned to the MRI section of the Department of Radiology at Los Angeles County-USC Medical Center (LAC-USC) on the third floor. While working full time as a CNA, Plaintiff attended Los Angeles City College and was on the verge of securing the necessary degree for his certification as a radiology technician.

9. During the early afternoon of March 19, 2014, "SL," a neurology patient referred to in this complaint by her initials to protect her privacy, was observed to have symptoms consistent with a possible stroke during a cranial angiogram in the CT section of the Radiology Department. The treating neurologists transported her down the hall for an emergency brain MRI. At around 3:00 p.m., shortly after Plaintiff started work for the day, he was directed to assist with the procedure.

10. Plaintiff retrieved the MRI table from the examination room, wheeled it into the MRI staging area, and prepared it for the patient. With multiple medical workers and other patients nearby, Plaintiff pulled a curtain and saw the patient, SL, for the first time. She had an IV, and appeared heavily medicated, as she was sleeping until the commotion woke her up. With the assistance of about five other workers, Plaintiff transferred SL from the gurney to the MRI table.

11. When instructed to do so, Plaintiff wheeled the table with the patient into the examination room. There is a large glass window through which multiple doctors were watching the procedure. Plaintiff explained to SL that he needed to place an oximeter on her finger. When he picked up her left arm, however, she pull her hand away and asked, "Are you the only one who could do this?" Plaintiff responded, "For now," adding: "This exam is very important and I'm sure time is a factor for the doctors who have been staring at the clock waiting for you to go in." Plaintiff perceived that the patient might be reacting due to racial prejudice. Plaintiff has had similar experiences since immigrating from Africa to the United States, and knows that such attitudes are best ignored. Plaintiff placed the oximeter on SL's index finger and land-marked her into the MRI Scanner for a brain scan. Plaintiff waited for a few seconds so he could respond if she became claustrophobic, as some patients do. She looked comfortable as he slid her into the belly of the scanner with her eyes closed. Plaintiff left the exam room, shut the door, and performed other duties.

12. When the exam was completed, Plaintiff returned to the exam room, pulled the table with SL out of the MRI Scanner, unhooked her index finger from the

oximeter and wheeled her outside to the staging area. The doctors assessed the patient's verbal, motor, and mental ability. With teamwork, the patient was moved from the MRI exam table back to the gurney. One doctor remained with SL pending transportation to the ward. Plaintiff was never alone with SL in the MRI section.

13. After the procedure, a doctor ordered that SL be taken to the intensive care unit (ICU) as soon as possible. First, however, Plaintiff was instructed to transport her back to her room, 5F136, which is located in a ward on the Fifth Floor that allows for close observation of patients similar to the ICU. Following training and protocol, Plaintiff wrote down the patient's name, medical record number and ward location, and recorded the time he left. SL was lethargic. During transportation, SL asked Plaintiff, "Do you have my underwear and stuff?" Plaintiff responded, "What are you talking about?" SL did not reply. Plaintiff pushed the patient to the elevator as a doctor walked with them. They rode the elevator together for two floors. They left the elevator together, and Plaintiff wheeled SL to her room, located directly across from a nursing station, with a sliding glass door that typically stays open. The doctor remained with the patient throughout the transport.

14. At the ward, the doctor spoke to a nurse while standing in front of the patient's room, close to the open door. Meanwhile, Plaintiff moved the patient from the gurney to the bed singlehandedly. Following his practice, Plaintiff explained the procedure to SL, who remained lethargic. Plaintiff raised the patient's bed to his waist level and secured the gurney to the right side of the bed. Plaintiff moved to the left side of the bed and grabbed the sheet that the patient was laying on, placing his right hand towards her shoulder and his left hand towards her hip. Plaintiff asked the patient to cross her arms to ease transfer, but she seemed too medicated and lethargic to cooperate. Due to the patient's weight, Plaintiff needed most of his strength to pull the patient from the gurney onto the bed. During this process the sheet on top of the patient moved, but did not come off, and she was not exposed. SL asked Plaintiff what he was doing, and he apologized for any difficulty moving her from gurney to bed.

- 4 -

15. As Plaintiff disengaged the gurney from the bed he noticed SL's belongings in a bag on the gurney, and realized why she had asked about "underwear and stuff." Plaintiff completed the transfer by bringing the bed down and raising the rails for her safety. He picked up SL's bag of belongings, placed it by her right side, and told her about it. SL remained covered by a sheet throughout the examination and transfer. Plaintiff left the patient's room, squeezing past the doctor and nurse, who were still standing in the hallway directly in front of door discussing patient care.

16. Plaintiff dropped off the chart at the nursing station and left the ward. Plaintiff was in the patient's room, with the door open and the doctor and nurse just outside, for only a few minutes, and was occupied with his duties. At about 4:30 p.m. Plaintiff returned to the MRI Unit in Radiology and worked on other matters.

17. At sometime between 6:00 and 7:00 p.m., SL, while still in a stupor from the combination of medications and the condition of her brain, told a nurse that she thought someone touched her inappropriately earlier that day in the hospital. The nurse told her that she imagined it. SL later told another nurse, who reported the statement to a supervisor. The supervisor reported the matter to the LASD without conducting any independent investigation. Deputy Carlos Vega responded and took a report from SL.

18. According to the report, SL "said she was transported by S/Tekoh from the forth [*sic*] floor of the inpatient tower to the third floor of the Inpatient Tower to the MRI section of the hospital." The falsity of that statement could have been quickly determined from the chart. Another health worker moved SL from the *fifth* floor to the CT section on the third floor, and then others moved her from the CT section to the MRI section. Plaintiff first saw her in the MRI section.

19. The report continues: "She said that when they arrived in the [MRI exam] room she was left by herself with S/Tekoh. V/[SL] closed her eyes and [*sic*] order to rest while her procedure began. V/[SL] said that within five minutes she saw S/Tekoh lift her bed sheet and uncover her. . . . S/Tekoh spread her vagina open. S/Tekoh held the left side of her vagina open with his left hand. S/Tekoh then placed his right hand

- 5 -

finger's [*sic*] in the victim's vagina." The falsity of this statement should have been obvious. Even if SL was technically "by herself" with Plaintiff in the MRI exam room, there were multiple doctors and technicians watching through a large glass window. There is no possibility that Plaintiff could have committed such an act in the exam room before, during, or after the MRIs.

20. Rather than checking out SL's story, which would have demonstrated she was deluded and hallucinating, if not fabricating deliberately, Deputy Vega immediately made arrangements through the nursing supervisors to confront Plaintiff. About 7:15 p.m. Plaintiff answered a call to the MRI scheduling office. A female asked whether the person who transported SL was still present. Plaintiff responded that he did the transfer from the MRI section to the ward on the Fifth Floor. Shortly thereafter, Deputy Vega and two nurse supervisors walked in the MRI Unit, where Plaintiff was talking with coworkers. Deputy Vega asked to speak to Plaintiff in private, and escorted him into the soundproof room used by doctors to read radiology images and prepare reports free from the noise of the machines. Deputy Vega sent the nurse supervisors away, and prevented Plaintiff's coworkers from coming in the room, saying the interview was private. Co-workers lingered outside the closed door, however.

21. Inside the room, where Plaintiff was in custody and not free to leave, Deputy Vega interrogated Plaintiff as a suspect without *Miranda* admonitions about touching SL's vagina. Plaintiff repeatedly denied any inappropriate contact with SL, assured Deputy Vega that he would never act in such a manner, and explained that a CNA could not commit such an act before or after a brain MRI or transport without medical staff noticing. Deputy Vega refused to accept Plaintiff's denials. Instead, he became more accusatory and verbally abusive.

22. Deputy Vega claimed to have a video recording of Plaintiff committing the sexual assault. Plaintiff found the remark funny. He began laughing as he said "Good luck." Plaintiff told Deputy Vega, "Whoever you have on that video will never be me, and by the way if you have me on video then what else do you want from me?

- 6 -

What are you still doing here with me? Isn't that more than enough evidence you need to arrest me?" Deputy Vega appeared to lose his composure. He told Plaintiff to "shut the fuck up," and then asked, rhetorically, "Did you just laugh at me? Am I a laughing stock? Is the patient upstairs that you assaulted a laughing stock? Oh you think it's funny? You trying to be smart with me?"

23. Plaintiff apologized for laughing, but explained why he thought the situation ridiculous. After more fruitless exchanges back and forth, Deputy Vega again seemed to shift character, virtually yelling, "You look guilty and I don't know why I'm still here wasting precious time with your black ass. I'm going to put your black ass where it belongs." Plaintiff demanded, "Let me out of this room now!" Deputy Vega gave Plaintiff a hard stare and said he was not free to leave until he admitted what he did to the patient. Plaintiff said that he needed a lawyer and walked to the door to leave the room. Deputy Vega cut him off, literally standing on Plaintiff's toes, their faces just inches apart. With his hand on his firearm, Deputy Vega threatened, "Mr. Jungle Nigga trying to be smart with me, you make any funny move you'll regret it. You must do as I say now. I'm about to hand you over to deportation, Boy, and your entire family will be rounded up and sent back to the jungle. Trust me I have the power to do it."

24. The situation no longer amused Plaintiff. He was terrified for his own safety and that of his family, who reside in the United States as immigrants, many with work permits who are therefore vulnerable to the collateral consequences of law enforcement actions. Plaintiff grew up as an oppressed minority in a despotic dictatorship where no one can challenge governmental authority. Police repression, including a severe beating at age 16, was among the reasons he immigrated.

25. Deputy Vega sat Plaintiff down in a chair, took a piece of paper from the copying machine and handed it to Plaintiff with a pen from his breast pocket. Deputy Vega threatened, "You're going to write down what the patient said you did since you seem to have memory loss now." Plaintiff reasoned that he should do what Deputy Vega demanded for his own immediate safety, as well as for the long term safety of his

1  family members because the many witnesses and the physical evidence, including video
2  and DNA, would exonerate him, and the confession would be exposed as phony.

3      26. Plaintiff wrote out a false, somewhat incriminating statement dictated to
4  him by Deputy Vega, stating that he "first saw her vagina accidentally," and "decided to
5  go further by . . . spreading her vagina lip for a quick view." Nothing of the sort
6  happened, as Plaintiff had told Deputy Vega repeatedly. At some point Defendant
7  LASD Sergeant Dennis Stangeland joined them. He asked more questions, such as
8  whether Plaintiff is attracted to females.

9      27. Deputy Vega arrested Plaintiff for violating Cal. Penal Code § 289(d),
10 sexual penetration by a foreign object. A patrol deputy transported Plaintiff to the
11 LASD's East Los Angeles station jail, where he was booked. Plaintiff's bail was set at
12 $100,000. Deputy Vega submitted, under oath, a false probable cause declaration that
13 stated: "The suspect admitted to spreading the victim's legs and penetrating the victim's
14 vagina with his fingers."

15     28. Plaintiff's family rallied to his support, loaning Plaintiff the $10,000
16 premium needed to bail him out the next morning. The arrest, including Plaintiff's mug
17 shot, was widely televised in Los Angeles, to the mortification of Plaintiff and his
18 family. Plaintiff received multiple calls from friends and co-workers who saw the story
19 on the television news and expressed their disbelief.

20     29. Because of the publicity, some other person accused Plaintiff of
21 victimizing her in the hospital. That resulted in another charge being filed and the
22 doubling of bail, which costs Plaintiff another $10,000. Preliminary investigation, which
23 should have taken place before the charges were filed, however, established that this
24 second supposed victim was in LAC-USC two years before Plaintiff began working
25 there and could not have been his victim.

26     30. Subsequent investigation clarified that the alleged victim, SL, made the
27 initial accusation against Plaintiff while in a state of severe confusion due to heavy
28 medications and an emergent brain abnormality. It is not uncommon for patients in

such a state to have vivid delusions and hallucinations, to imagine things that did not happen, and to misconstrue or misinterpret actions of medical providers. They not infrequently cling to irrational beliefs despite overwhelming evidence to the contrary. Deputy Vega, however, reinforced SL's delusions by telling her that Plaintiff admitted to the sexual assault, and to masturbating while it was in progress.

31.   None of the witnesses corroborated SL's delusional accusation. To the contrary, each spoke about Plaintiff positively and explained that the assault could not have happened as SL described it because there were too many people around. The sole corroboration for the accusation was the *Miranda*-less, coerced confession.

32.   The criminal case dragged on for two years. In the midst of the first trial during the Summer of 2015, a prosecution witness revealed that a testable amount of male DNA had been recovered from SL's vagina and had not been tested. A mistrial was declared and the DNA tested against Plaintiff, who was excluded as the donor. The case finally went to trial during February 2016. On March 1, 2016, a jury acquitted Plaintiff after brief deliberations. This lawsuit follows.

## DAMAGES

33.   As a direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the defendants, Plaintiff had these despicable criminal charges hanging over him for two years. He suffered and will continue to suffer great mental and physical pain, major depression, constant suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension, which have caused Plaintiff to sustain general damages in a sum to be determined at trial.

34.   As a further direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the defendants, Plaintiff suffered past and suffer future losses of income, and has incurred past legal and medical expenses, and will incur future medical expenses, all of which have caused Plaintiff to sustain special damages in a sum to be determined at trial.

35. The individually named and doe defendants, excluding defendants County of Los Angeles and Los Angeles Sheriff's Department, acted outside the scope of their jurisdiction and without authorization of law, and separately and in concert. The aforementioned acts of the defendants, and each of them, was willful, wanton, malicious and oppressive, with reckless disregard or with deliberate indifference and with the intent to deprive Plaintiff of their constitutional rights and privileges, and did in fact violate the aforementioned rights and privileges, entitling Plaintiff to exemplary and punitive damages in an amount to be proven at the trial of this matter.

## FIRST CLAIM FOR RELIEF
## DEPRIVATION OF CIVIL RIGHTS -- 42 U.S.C. § 1983

(Fourth, Fifth and Fourteenth Amendments – Individual Liability)

36. The individual and doe defendants, while acting under color of law, deprived Plaintiff of rights secured by the Fourth Fifth and Fourteenth Amendments by, among other things, detaining him in without reasonable suspicion and in an unreasonable manner, arresting him without probable cause and in an unreasonable manner, subjecting him to a coercive interrogation, generating an involuntary and false confession in violation of *Miranda*, submitting the coerced, involuntary and false confession, along with false and fabricated reports, to the district attorney's office to overcome the independent judgment of the prosecutor and to cause Plaintiff to be prosecuted for a sexual assault on a hospital patient. Defendants filed false reports and testified falsely about the circumstances of the coerced, involuntary and false confession under oath during the criminal proceedings, causing Plaintiff to be deprived of substantive and procedural due process and to be subjected to malicious prosecution.

37. Plaintiff was damaged as alleged above.

**SECOND CLAIM FOR RELIEF**

**DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. § 1983**

(Entity Liability)

38.     Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, defendants County of Los Angeles and LASD, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of Plaintiff, including the right to be free from unreasonable searches and seizures under the Fourth Amendment, the right to be free from coercive interrogations, the right to procedural and substantive due process, and to not be prosecuted based on falsified evidence or coerced and involuntary confessions extracted in violation of *Miranda*, maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or applied, among others, the following policies, practices and customs:

(a)     failing to adequately train, supervise, and control its deputies in investigating crimes;

(b)     failing to adequately train, supervise, and control its deputies in conducting detentions without reasonable suspicion or arrests without probable cause;

(c)     failing to adequately train, supervise, and control its deputies in protecting the right of arrestees to be free from coercive custodial interrogations which lead to false and involuntary confessions in violation of *Miranda*.

(d)     failing to adequately train, supervise, and control its deputies in protecting the substantive and procedural due process rights of arrestees to be free from malicious prosecutions and prosecutions based on falsified evidence, false reports, or coerced and involuntary confessions;

(e)     failing to adequately train, supervise, and control its deputies from filing false reports or giving false testimony under oath in criminal proceedings;

(f)     failing to adequately discipline deputies involved in dishonesty or otherwise abusing their authority; and

  (g) condoning and encouraging deputies in the belief that they can violate the rights of persons such as the Plaintiff in this action with impunity, and that such conduct will not adversely affect their opportunities for promotion and other employment benefits.

39. As a direct and proximate result of the foregoing, Plaintiff sustained injuries and damages as proved.

**PRAYER**

WHEREFORE, plaintiff requests relief as follows, and according to proof, against each defendant:

1. General and compensatory damages in an amount according to proof;

2. Special damages in amounts according to proof;

3. Exemplary and punitive damages against each individual and doe defendant, not against the County of Los Angeles or the Los Angeles Sheriff's Department, in an amount according to proof;

4. Costs of suit, including attorneys' fees, under 42 U.S.C. § 1988; and,

5. Such other relief as may be warranted or as is just and proper.

Dated: September 26, 2016  THE LAW OFFICES OF JOHN BURTON

By:  /s/ John Burton
   John Burton
   Attorneys for Plaintiff

**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury.

Dated: September 26, 2016    THE LAW OFFICES OF JOHN BURTON

By: /s/ John Burton
_____
John Burton
Attorneys for Plaintiff