John Burton, State Bar No. 86029
jb@johnburtonlaw.com
THE LAW OFFICES OF JOHN BURTON
128 North Fair Oaks Avenue
Pasadena, California  91103
Tel:  (626) 449-8300/Fax: (626) 449-8197

Maria Cavalluzzi, State Bar No. 128377
maria@cavalluzzi.com
CAVALLUZZI & CAVALLUZZI
6430 Sunset Blvd., Suite 1180
Los Angeles, California  90028
Tel: (323) 467-2300/Fax: (323) 467-2308

Attorneys for Plaintiff Terence B. Tekoh

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERENCE B. TEKOH,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>COUNTY OF LOS ANGELES,<br>SGT. DENNIS STANGELAND and<br>DEPUTY CARLOS VEGA,<br><br>　　　　Defendants. | Case No.  16-cv-7297 GW (SKx)<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS UNDER COLOR OF STATE LAW**<br><br>**DEMAND FOR JURY TRIAL** |

## JURISDICTION AND VENUE

1.　　This case arises under 42 U.S.C. § 1983. Accordingly, subject matter jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343.

2.　　Plaintiff's claims arise out of a course of conduct involving officials of the County of Los Angeles, in the County of Los Angeles, State of California, and within this judicial district.

**PARTIES**

3.      Plaintiff Terence B. Tekoh is an adult competent to prosecute an action on his own behalf. He is an immigrant from Cameroon with a green card presently residing lawfully in the United States. He intends to become a naturalized citizen.

4.      At the relevant times, Defendant Dennis Stangeland was a Los Angeles Sheriff's Department (LASD) sergeant and  Defendant Carlos Vega was an LASD deputy. In committing the acts alleged, each acted within the scope of his respective employment and under color of state law.

5.      Defendants acted within the scope of their employment with the County of Los Angeles and the LASD, and therefore under color of California state  law.

6.       County of Los Angeles is no longer a defendant, but remains the first named party defendant in the caption to avoid confusion.

**FACTS**

7.      On March 19, 2014, Plaintiff Terence Tekoh was 25 years old, a certified nurse assistant (CNA) employed by Cross Country Per Diem, a registry. For almost two years, from August 16, 2012, to March 19, 2014, Mr. Tekoh worked a full-time schedule in the MRI section of the Department of Radiology at Los Angeles County + USC Medical Center (LAC + USC), which is located on the third floor of the main inpatient tower. Plaintiff attended Los Angeles City College to secure the necessary courses for his certification as an x-ray and radiology technician. Plaintiff planned to have a long career as a health care provider specializing in radiology and other types of imaging. He was popular with co-workers, enjoyed the work and was good at it.

8.      A critically ill neurology patient ("the Patient") was admitted to LAC + USC through the emergency room on March 15 and 16 with a diagnosis of intra-cerebral bleeding in the occiput, an aneurism or stroke. Common side effects include confusion, disorientation, distorted memory, altered perception, blurred vision, and impaired judgment. The Patient was ultimately assigned Room 5F136, which is located in an intermediate ward on the Fifth Floor of the inpatient tower.

9. At 1:00 p.m. on March 19, 2014, the Patient's treating doctors ordered two doses of fentanyl, a powerful synthetic opioid analgesic that is similar to morphine but is 50 to 100 times more potent, and has common side effects that include confusion, abnormal thinking, hallucinations and anxiety. There was also an order for midazolam, an anti-anxiety drug and sedative that has common side effects including confusion and mood swings. The fentanyl and midazolam can have a synergistic effect, causing intensification of those side effects.

10. A hospital worker other than Plaintiff transported the Patient from the fifth floor ward to the CT section of the Radiology Department on the third floor. Doctors inserted a needle into an artery in the Patient's groin to inject contrast for a cranial angiogram. During the CT procedure the Patient experienced a serious complication, apparently a side effect of the contrast, and exhibited severe stroke-like symptoms, including left-side paralysis. The doctors rushed the Patient down the hall for an emergency brain MRI. At around 3:00 p.m., shortly after Plaintiff started work for the day, he was directed to assist with that "stat" procedure.

11. As soon as another patient already in the scanner completed an MRI, Plaintiff took that patient out, retrieved the MRI table, wheeled it into the staging area, and cleaned it for the Patient. With multiple medical workers and other patients nearby, Plaintiff pulled a curtain and saw the Patient for the first time. She appeared heavily medicated, as she was sound asleep until the commotion woke her up. Plaintiff moved the gurney into the staging area and, with the assistance of about five other workers, moved the Patient from the gurney to the MRI table.

12. Plaintiff wheeled the Patient into the examination room that houses one of LAC + USC's three MRI scanners. There is a large glass window through which multiple doctors were anxiously watching the preparation and procedure. Plaintiff explained to the Patient that he needed to place a pulse oximeter on her finger. When he picked up her left arm, however, she pull her hand away and asked, "Are you the only one who can do this?" Plaintiff responded, "For now," adding: "This exam is very

important and I'm sure time is a factor for the doctors who have been staring at the clock waiting for you to go in." Plaintiff perceived that the Patient might be reacting due to racial prejudice. Plaintiff has had similar experiences since immigrating from Africa to the United States, and knows that such attitudes are best ignored. Plaintiff placed the pulse oximeter on the Patient's index finger and land-marked her into the MRI Scanner for a brain scan. Plaintiff waited for a few seconds so he could respond if she became claustrophobic, as patients sometimes do. She had her eyes closed as he slid her into the belly of the scanner. When she appeared to be comfortable with the procedure, Plaintiff left the exam room, shut the door, and performed other duties for the half-hour or so while the Patient was in the scanner.

13.     When the exam was completed, Plaintiff returned to the exam room, pulled the table with the Patient out of the MRI Scanner, unhooked her index finger from the pulse oximeter, and wheeled her outside to the staging area. The doctors assessed the Patient's verbal, motor, and mental ability. Again with teamwork, the Patient was moved from the MRI exam table back to the gurney. One doctor remained with the Patient pending transportation back to the ward. Plaintiff was never alone with the Patient in the MRI section, and all his interactions with the Patient were in front of multiple doctors and were directly related to the emergency MRI.

14.     Plaintiff transported the Patient back to her room. Following protocol, Plaintiff wrote down the Patient's name, medical record number and location, Room 5F136, and recorded the time he left. The Patient was lethargic and seemed medicated, nodding in and out of consciousness. During the transportation, the Patient asked Plaintiff, "Do you have my underwear and stuff?" Plaintiff responded, "What are you talking about?" The Patient fell back asleep without answering.  Plaintiff pushed the Patient to the elevator as a doctor walked with them. They rode the elevator together up two floors. They left the elevator together, and Plaintiff wheeled the Patient to her room, located directly across from a nursing station, with a glass door that typically stays open. The doctor observed the Patient throughout the transport.

15.     At the ward, the doctor spoke to a nurse while standing in front of the Patient's room, close to the open door. Meanwhile, Plaintiff had to move the Patient from the gurney to the bed singlehandedly. Following his practice, Plaintiff explained the procedure to the Patient, who remained lethargic and barely able to stay awake. Plaintiff raised the Patient's bed to waist level and secured the gurney to the right side of the bed. Plaintiff moved to the left side and grabbed the sheet that the Patient was laying on, placing his right hand towards her shoulder and his left hand towards her hip. Plaintiff asked the Patient to cross her arms to ease transfer, but she seemed too medicated and lethargic to cooperate. Plaintiff needed most of his strength to pull the Patient from the gurney onto the bed. During this process the sheet on top of the Patient moved, but did not come off, and she was not exposed. The Patient woke up and asked Plaintiff what he was doing, Plaintiff apologized for any difficulty moving her from the gurney to bed. She then went back to sleep.

16.     As Plaintiff disengaged the gurney from the bed he noticed the Patient's belongings in a bag on the gurney, and understood why she asked about "underwear and stuff." Plaintiff completed the transfer by bringing the bed down and raising the rails for safety. He picked up the Patient's bag of belongings, placed it by her right side, and told her about it. The Patient remained covered by a sheet throughout the transfer and seemed asleep most of the time. Plaintiff left the Patient's room, squeezing past the doctor and nurse, who were still standing in the hallway directly in front of the door discussing patient care.

17.     Plaintiff dropped off the chart at the nursing station and left the ward. Plaintiff was in the Patient's room, with the door open and the doctor and nurse just outside, for only a few minutes, and was occupied with his duties. At about 4:30 p.m. Plaintiff returned to the MRI Unit in Radiology and worked on other matters.

18.     Sometime later that afternoon, while still in a stupor from the medications and the condition of her brain, the Patient told a nurse on the fifth floor that she thought a hospital worker had touched her inappropriately. The nurse told her that she

- 5 -

imagined it. The Patient was moved to a room in the ICU on the fourth floor, where the Patient told another nurse that she had been touched inappropriately, and complained that the first nurse had not acted. The Patient was agitated. The second nurse relayed her complaint to a supervisor, who then called the LASD. Neither the second nurse nor the two LAC + USC supervisors who spoke briefly to the Patient indicated that they thought anything inappropriate had happened.

19.    At 7:04 p.m., an LASD dispatcher assigned the call to Defendant Carlos Vega, a deputy assigned to LAC + USC. Deputy Vega walked to the ICU, asked the nurse which patient had complained, and then spoke to the Patient, whom he assumed to be medicated and who appeared to him to be under medication. The Patient was agitated and told Deputy Vega that the nurses with whom she spoke did not believe that she had been touched inappropriately. Deputy Vega listened for a few minutes, but there is no audio recording or contemporaneous notes of what the Patient said. The contents of the conversation to which the Patient would later testify are not the same as the version of the conversation stated on Deputy Vega's initial crime report.

20.    According to both the Patient and Deputy Vega, the Patient said that a hospital worker digitally penetrated her vagina for no medical purpose. The Patient did not identify the hospital worker by name, and at most gave only a general physical description. Deputy Vega said, "We'll get him." After talking with the Patient, Deputy Vega did not have probable cause to arrest anyone. When asked by a deputy district attorney at a subsequent hearing,  "At the time you initially interviewed her at that point did you think – at that point did you know that a crime or you had enough to arrest an individual for a crime?" Deputy Vega answered, "Not at all." Plaintiff agrees.

21.    Deputy Vega asked a nurse to tell him who had transported the Patient. Several hospital workers had transported the Patient that day. A nurse called the MRI section and spoke to Plaintiff, who said that he transported the Patient back to her room on the fifth floor. A nurse told  Deputy Vega that Terence Tekoh from MRI had transported the Patient. That was the first time Deputy Vega heard the name.

22.     Rather than checking out the Patient's story, which would have demonstrated that she was deluded and hallucinating from the combination of her brain pathology and medications, if not fabricating deliberately, Deputy Vega immediately made arrangements through nursing supervisors to confront Plaintiff. Deputy Vega did not verify that Plaintiff was the hospital worker to whom the Patient referred. For example, Deputy Vega did not show the Patient a photograph of Plaintiff, or take Plaintiff to the Patient's room for a field identification.

23.     Deputy Vega and two nurse supervisors walked into the MRI Unit, where Plaintiff was present with coworkers.  The nurse supervisors left. Deputy Vega asked "Who's Terence," and Plaintiff said, "I'm Terence." Deputy Vega said, "I need to talk to you in private." One of the co-workers pointed out the small soundproof "reading room" used by doctors to read radiology images and prepare reports free from the noise of the machines. Deputy Vega directed Plaintiff into the reading room and shut the door, preventing coworkers from following, saying the interview was private. Plaintiff was in effect in custody and under arrest.

24.     Deputy Vega did not provide Plaintiff with *Miranda* admonitions, although he had a card from which he could have read them. Deputy Vega asked Plaintiff whether he had been arrested before, and Plaintiff answered "No." Deputy Vega asked whether Plaintiff was a citizen, and Plaintiff answered "No." Deputy Vega asked "What did you do to the patient," and Plaintiff asked which patient. Deputy Vega said the situation was "very, very serious" because he had Plaintiff "on video abusing a patient." Deputy Vega accused Plaintiff of touching the Patient's vagina during the MRI procedure. Plaintiff found the remark funny. He began laughing as he said, "Good luck with that," and asked "Is this what this is is all about?" Plaintiff repeatedly and adamantly denied any inappropriate contact with the Patient. Plaintiff assured Deputy Vega that he would never act in such a manner, and explained that a CNA could not commit such an act before or after a brain MRI or transport without medical staff noticing.

25.     Deputy Vega refused to accept Plaintiff's denials. Instead, he became more accusatory and verbally abusive. Deputy Vega accused Plaintiff of touching the Patient's vagina, and made crude comments, such as "What were you going to do, lick it?" Plaintiff told Deputy Vega, "Whoever you have on that video will never be me, and by the way if you have me on video then what else do you want from me? What are you still doing here with me? Isn't that more than enough evidence you need to arrest me?" Deputy Vega lost his composure. He told Plaintiff to "shut the fuck up," and then asked, rhetorically, "Did you just laugh at me? Am I a laughing stock? Is the patient upstairs that you assaulted a laughing stock? Oh you think it's funny? You trying to be smart with me?"

26.     Plaintiff apologized for laughing, but explained why he thought the situation ridiculous. There were more fruitless exchanges back and forth, during which Plaintiff kept trying to explain what he did, with Deputy Vega repeatedly cutting him off and accusing him of sexual assault. Deputy Vega again seemed to shift character, virtually yelling, "You look guilty and I don't know why I'm still here wasting precious time with your black ass. I'm going to put your black ass where it belongs." Plaintiff demanded, "Let me out of this room now!" Deputy Vega gave Plaintiff a hard stare and said he was not free to leave until he admitted what he did to the Patient. Plaintiff said that he needed to speak to a supervisor or a lawyer and walked to the door to leave the room. Deputy Vega cut him off, literally standing on Plaintiff's toes, their faces just inches apart. With his hand on his firearm, Deputy Vega threatened, "Mr. Jungle Nigga trying to be smart with me, you make any funny move you'll regret it. You must do as I say now. I'm about to hand you over to deportation, Boy, and your entire family will be rounded up and sent back to the jungle. Trust me I have the power to do it."

27.     The situation no longer amused Plaintiff. He was terrified for his own safety and that of his family members, who reside in the United States as immigrants, many with work permits that make them vulnerable to the collateral consequences of law enforcement actions. Plaintiff grew up as an oppressed minority in a despotic

dictatorship where no one can challenge governmental authority. Police repression of his English-speaking minority was among the reasons he immigrated.

28.     Deputy Vega sat Plaintiff down in a chair, took a piece of paper from the copying machine and handed it to Plaintiff with a pen from his breast pocket. Deputy Vega threatened, "You're going to write down what the patient said you did since you seem to have memory loss now. We're going to do it my way now." Plaintiff reasoned that he should do what Deputy Vega demanded for his own immediate safety, as well as for the long term safety of his family members because the many witnesses and the physical evidence, including video and DNA, would exonerate him, and the confession would be exposed as phony.

29.     Deputy Vega dictated to Plaintiff what he was to write. Plaintiff felt he had no choice. Plaintiff wrote out the false, somewhat incriminating statement dictated to him by Deputy Vega, writing that he "first saw her vagina accidentally," and "decided to go further by . . . spreading her vagina lip for a quick view." Nothing of the sort happened, as Plaintiff had told Deputy Vega repeatedly.

30.     Before Plaintiff finished writing down the statement being dictated to him, Deputy Vega told him to stop. Deputy Vega stepped outside the room and summoned his supervisor, Defendant LASD Sergeant Dennis Stangeland. Although Sgt. Stangeland was in his office and had a video recorder, there was no attempt made to bring the recording device. Deputy Vega then came back into the reading room and continued dictating the statement to Plaintiff. Around the time Plaintiff finished writing out the statement, Sgt. Stangeland opened the door, walked into the reading room, shut the door behind him, and had a brief conversation with Deputy Vega. Sgt. Stangeland could see that Plaintiff was in custody being interrogated about an alleged sexual assault, and that he was writing out a supposed confession. Sgt. Stangeland correctly assumed that Plaintiff had not been given *Miranda* admonitions.

31.     Without first giving Plaintiff *Miranda* admonitions, Sgt. Stangeland asked Plaintiff, "Why did you do it?" Plaintiff responded, "I didn't do anything."

- 9 -

32.     Sgt. Stangeland asked whether Plaintiff is attracted to females, and he responded, "Yes." Sgt. Stangeland asked whether Plaintiff became aroused when he touched the Patient. Plaintiff was stunned speechless that the supervisor would not accept his denial. Plaintiff just shook his head, as he could not answer Sgt. Stangeland's loaded question without admitting to something that he did not do. Sgt. Stangeland and Deputy Vega decided to arrest Plaintiff for violating Cal. Penal Code § 289(d), sexual penetration by a foreign object. After about five minutes in the room, Sgt. Stangeland left, and summoned a deputy named Carrillo to transport Plaintiff to a station jail. Sgt. Stangeland instructed Deputy Vega to notify the LASD "Special Victims Bureau" (SVB), but Deputy Vega failed to do so until two-and-a-half hours later.

33.     Plaintiff asked Deputy Vega for permission to return to work. Deputy Vega said, "Nope," and yanked Plaintiff's employee badge off of him as Deputy Carillo came into the reading room. Deputy Vega then handcuffed Plaintiff and told him he was under arrest. Plaintiff was led out of the reading room after having spent at least one hour in custody. Deputy Carrillo drove Plaintiff to the LASD's East Los Angeles station jail, where he was booked. Plaintiff's bail was set at $100,000. By failing to notify SVB, as directed, and by sending Plaintiff to jail, rather than to a facility for forensic testing, Deputy Vega lost the exculpatory evidence on Plaintiff's hands that would have demonstrated he did not digitally penetrate the Patient's vagina.

34.     Deputy Vega returned to the Patient. Although she had never confirmed to Deputy Vega that Plaintiff was actually the same person that she claimed assaulted her, Deputy Vega told her that her assailant had been arrested, and that he had confessed to masturbating while touching her vagina.

35.     Deputy Vega then drove to the office of his watch commander, Lt. Stanley, where he submitted, under oath, a false declaration that stated as probable cause for the arrest: "The suspect admitted to spreading the victim's legs and penetrating the victim's vagina with his fingers." There is no mention of any statement by the Patient in connection with probable cause for Plaintiff's arrest.

36.     Deputy Vega returned to his office at LAC + USC, where he drafted a false and incomplete initial crime report. According to Deputy Vega's report, the Patient "said she was transported by S/Tekoh from the forth [*sic*] floor of the inpatient tower to the third floor of the Inpatient Tower to the MRI section of the hospital." The Patient denies making that statement. Moreover another health worker moved the Patient from the *fifth* floor to the CT section on the third floor, and then her team of doctors and others moved her from the CT section to the MRI section after her apparent stroke. Plaintiff first saw her in the MRI section.

37.     The report continues: the Patient "said that when they arrived in the [MRI exam] room she was left by herself with S/Tekoh. [The Patient] closed her eyes and [*sic*] order to rest while her procedure began. [The Patient] said that within five minutes she saw S/Tekoh lift her bed sheet and uncover her. . . . S/Tekoh spread her vagina open. S/Tekoh held the left side of her vagina open with his left hand. S/Tekoh then placed his right hand finger's [*sic*] in the victim's vagina." The Patient denies telling Deputy Vega that the assault happened in that location at that time. Even were the Patient technically "by herself" with Plaintiff in the MRI exam room, there were multiple doctors and technicians watching through a large glass window. There is no possibility that Plaintiff could have committed such an act in the exam room before, during, or after the MRI. The report states, "The victim recognized the suspect from previous transports." The Patient denies making that statement. It is also factually incorrect.

38.     Deputy Vega's initial report describes the interrogation in terms not only the polar opposite of Plaintiff's, but also not matching the subsequent testimony of Sgt. Stangeland and Deputy Vega. The report falsely states that Sgt. Stangeland and Deputy Vega were together when they contacted Plaintiff. The report falsely quotes Plaintiff as saying that he transported the Patient "from the forth [*sic*] floor room (4C120) to the third floor room (3D328)" – located in the Radiology Department – and "waited for the doctor to leave before he touched her." The report falsely states that after this purported admission, Plaintiff was asked to write a confession.

- 11 -

39.     Plaintiff's family rallied to his support, loaning Plaintiff the $10,000 premium needed to bail him out the next morning. The arrest, including Plaintiff's mug shot, was widely televised in Los Angeles, to the mortification of Plaintiff and his family. Plaintiff received multiple calls from friends and co-workers who saw the story on the television news and expressed their disbelief.

40.     Because of the publicity, some other person accused Plaintiff of victimizing her in the hospital. That resulted in another charge being filed and the doubling of bail, which costs Plaintiff another $10,000. Preliminary investigation, which should have taken place before the charges were filed, however, established that this second supposed victim was in LAC + USC two years before Plaintiff began working there and could not have been a victim.

41.     The subsequent SVB investigation confirmed that the Patient made the initial report while in a state of severe confusion due to heavy medications and an emergent brain abnormality. It is not uncommon for patients in such a state to have vivid delusions and hallucinations, to imagine things that did not happen, and to misconstrue or misinterpret actions of medical providers. They not infrequently cling to irrational beliefs despite overwhelming evidence to the contrary. Deputy Vega, however, reinforced the Patient's delusions, and focused them on Plaintiff, by telling her that Plaintiff admitted to the sexual assault, and to masturbating while it was in progress.  No witnesses corroborated the Patient's delusional accusation. To the contrary, each spoke about Plaintiff positively and explained that the assault could not have happened as the Patient described because there were too many people around. The sole corroboration was the *Miranda*-less, coerced confession.

42.     Plaintiff had to wear an ankle bracelet as a condition of bail as the criminal case dragged on for almost two years, costing Plaintiff tens of thousands of dollars for bail renewal, bracelet rental, investigators, experts and attorneys' fees. There were so many appearances and so much stress that Plaintiff was unable to work.

43.     In the midst of the first trial during the Summer of 2015, a prosecution witness revealed that a testable amount of male DNA had been recovered from the Patient's vagina and had not been tested. A mistrial was declared and the DNA tested against Plaintiff, who was excluded as the donor. (The Patient later testified to having sex with her boyfriend shortly before her hospitalization.) The case finally went to trial during February 2016. On March 1, the jury acquitted Plaintiff after brief deliberations. The jurors met with Plaintiff after rendering the verdict and advised him to sue Defendants. This lawsuit follows.

## DAMAGES

44.     As a direct and proximate result of the acts, omissions and decisions of Defendants, Plaintiff had a despicable criminal charge hanging over him for almost two years. He suffered and will continue to suffer great mental and physical pain, major depression, constant suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension, which have caused Plaintiff to sustain general damages in a sum to be determined at trial.

45.     As a further direct and proximate result of the acts, omissions and decisions of Defendants, Plaintiff suffered past and will suffer future losses of income, as he is not mentally or emotionally able to continue his career in the health care field and will have to pursue less lucrative and more ill-fitted employment opportunities. Plaintiff has incurred legal expenses defending the criminal case, all of which have caused Plaintiff to sustain special damages in a sum to be determined at trial.

46.     Defendants acted outside the scope of their jurisdiction and without authorization of law, and separately and in concert. The aforementioned acts of the defendants, and each of them, was willful, wanton, malicious and oppressive, with reckless disregard or with deliberate indifference and with the intent to deprive Plaintiff of his constitutional rights and privileges, and did in fact violate the aforementioned rights and privileges, entitling Plaintiff to exemplary and punitive damages in an amount to be proven at the trial of this matter.

**FIRST CLAIM FOR RELIEF**

**DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. § 1983**

(Fourth, Fifth and Fourteenth Amendments)

(Against Defendant Carlos Vega)

47.    Defendant Carlos Vega, while acting under color of law, deprived Plaintiff of rights secured by the Fourth, Fifth and Fourteenth Amendments in each of the following respects:

(a)    By directing Plaintiff into a small (10' by 10'), windowless room, shutting the door, confronting Plaintiff with supposed evidence of guilt, denying his request to speak to a supervisor or lawyer, preventing him from leaving, threatening him with violence and deportation, and other acts, including those alleged above, and by so imprisoning Plaintiff for approximately one hour, Defendant Vega de facto arrested Plaintiff. Because he had no probable cause for the de facto arrest, the detention violated the Fourth Amendment.

(b)    Defendant Vega subjected Plaintiff, while in custody for Fifth-Amendment purposes, to a coercive and illegal interrogation, in violation of *Miranda*, generating an involuntary and false confession, which caused Plaintiff to be prosecuted for a sexual assault that he did not commit, an independent violation of the Fifth Amendment, and proximately causing all the damages alleged above.

(c)    After coercing an illegal and false confession from Plaintiff, Deputy Vega arrested Plaintiff without probable cause, in violation of the Fourth Amendment, proximately causing his prosecution and all the damages alleged above.

(d)    By not sending Plaintiff for forensic testing of his hands, and by falsely telling the Patient that Plaintiff confessed to masturbating while touching her vagina, Deputy Vega so compromised evidence in the criminal investigation and prosecution as to deny Plaintiff due process as guaranteed by the Fourteenth

- 14 -

Amendment, proximately causing Plaintiff's prosecution and all the damages alleged above.

(e)     Defendant Vega filed a deliberately false declaration of probable cause and a deliberately false, misleading and incomplete initial crime report, and based thereon testified falsely about the statements made by the Patient, the identification of Plaintiff as a possible suspect, and the circumstances of the coerced, involuntary and false confession of Plaintiff. The declaration, the initial report, and the related testimony caused Plaintiff to be deprived of substantive and procedural due process guaranteed by the Fourteenth Amendment, proximately causing his prosecution and all the damages alleged above.

**SECOND CLAIM FOR RELIEF**

**DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. § 1983**

(Fourth, Fifth and Fourteenth Amendments)

(Against Defendant Dennis Stangeland)

48.     Defendant Dennis Stangeland, while acting under color of law, deprived Plaintiff of rights secured by the Fourth, Fifth and Fourteenth Amendments in each of the following respects:

(a)     Defendant Stangeland, in concert with Deputy Vega, subjected Plaintiff, while in custody for Fifth-Amendment purposes, to a coercive and illegal interrogation, in violation of *Miranda*, generating an involuntary and false confession, which caused Plaintiff to be prosecuted for a sexual assault that he did not commit, a violation of the Fifth Amendment that proximately caused all the damages alleged above.

(b)     After the illegal and false confession was coerced from Plaintiff, Sgt. Stangeland authorized Deputy Vega to arrest Plaintiff without probable cause, in violation of the Fourth Amendment, proximately causing his prosecution and all the damages alleged above.

(c)     Defendant Stangeland filed a deliberately false, misleading and incomplete supplemental report. The supplemental report omits the fact that Plaintiff was in custody and had not been provided *Miranda* admonitions when questioned in his presence. Sgt. Stangeland's report omits Plaintiff's denial of the accusation that he touched the Patient inappropriately. Sgt. Stangeland's report falsely states that Plaintiff admitted in his presence to touching the Patient's vagina.  Sgt. Stangeland's report falsely states that Plaintiff told him that he became sexually aroused when he touched the Patient. Sgt. Stangeland's false, misleading and incomplete supplemental report caused Plaintiff to be deprived of substantive and procedural due process guaranteed by the Fourteenth Amendment, proximately causing his prosecution and all the damages alleged above.

49.     Sgt. Stangeland was Deputy Vega's direct supervisor, and had the opportunity and ability to intervene and prevent Deputy Vega's violations of Plaintiff's constitutional rights. Sgt. Stangeland knowingly refused to terminate a series of acts by his subordinate Deputy Vega that he knew or reasonably should have known would cause Deputy Vega to deprive Plaintiff of his Fourth-, Fifth- and Fourteenth-Amendment rights.

50.     Sgt. Stangeland knew that Deputy Vega was engaging in these acts and knew or reasonably should have known that Deputy Vega's conduct would deprive Plaintiff of his Fourth-, Fifth- and Fourteenth-Amendment rights and failed to act to prevent his subordinate from engaging in such conduct.

51.     Sgt. Stangeland engaged in conduct that showed a reckless or callous indifference to the deprivation by Deputy Vega of Plaintiff's Fourth-, Fifth- and Fourteenth-Amendment rights, and his conduct was so closely related to the deprivation of Plaintiff's rights as to be the moving force that caused the ultimate injury.

**PRAYER**

WHEREFORE, Plaintiff requests relief as follows, and according to proof, against each Defendant:

1. General and compensatory damages in an amount according to proof;

2. Special damages in an amount according to proof;

3. Exemplary and punitive damages against each Defendant in an amount according to proof;

4. Costs of suit, including attorneys' fees, under 42 U.S.C. § 1988; and,

5. Such other relief as may be warranted or as is just and proper.

Dated:  June 4, 2017   THE LAW OFFICES OF JOHN BURTON
         CAVALLUZZI & CAVALLUZZI

            /s/ John Burton
        By: _____
            John Burton
            Attorneys for Plaintiff

**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury.

Dated: June 4, 2017   THE LAW OFFICES OF JOHN BURTON
         CAVALLUZZI & CAVALLUZZI

            /s/ John Burton
        By: _____
            John Burton
            Attorneys for Plaintiff