UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 16-7297-GW (SKx) | Date | August 28, 2017 |
|---|---|---|---|
| Title | *Terence B. Tekoh v. County of Los Angeles, et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | | |
|---|---|---|---|
| Javier Gonzalez | None Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: | |
| None Present | None Present | |

**PROCEEDINGS:** IN CHAMBERS - FINAL DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE SUMMARY ADJUDICATION [40]

The Court's Final Decision on Defendants' Motion for Summary Judgment, or in the Alternative, Summary Adjudication [40] is attached hereto.

: 

Initials of Preparer  JG

## I. Background

Plaintiff Terence B. Tekoh ("Tekoh" or "Plaintiff") sues two Los Angeles Sheriff's Department ("LASD") sergeants: Carlos Vega ("Vega") and Dennis Stangeland ("Stangeland") for violations of his civil rights.[1] *See generally* First Amended Complaint, Docket No. 37. Plaintiff asserts two claims of violations of 42 U.S.C. § 1983. First, Plaintiff alleges that Vega deprived him of his rights under the U.S. Constitution by: (1) arresting him without probable cause in violation of the Fourth Amendment; (2) subjecting him to coercive custodial interrogation and generating an involuntary and false confession in violation of the Fifth Amendment; and (3) fabricating evidence to cause Plaintiff to be maliciously prosecuted in violation of the Fourteenth Amendment. *Id.* ¶ 47. Second, Plaintiff asserts that Stangeland violated Plaintiff's constitutional rights by (among other things): (1) working in concert with Vega, subjecting Plaintiff to coercive interrogation and generating a false confession, which caused Plaintiff to be prosecuted in violation of the Fifth Amendment; (2) authorizing Vega to arrest Plaintiff without probable cause in violation of the Fourth Amendment; and (3) filing a false, misleading, and incomplete police report. *Id.* ¶ 48.

Defendants now move for summary judgment or, in the alternative, partial summary judgment. *See generally* Defendants' First Amended Motion for Summary Judgment ("Motion") and concomitant evidentiary materials, Docket No. 42; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Opp'n"), Docket No. 45, and concomitant evidentiary materials, Docket Nos. 46-50; Defendants' Reply to Plaintiff's Opposition ("Reply"), Docket No. 55; Defendants' Response and Objections to Plaintiff's Statement of Genuine Disputes ("DRO"), Docket No. 56; and Defendants' Request for Evidentiary Ruling on Specified Objections, Docket No. 57.

## II. Legal Standard As To Summary Judgments

Under Rule 56 of the Federal Rules of Civil Procedure, a party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought, and the court shall grant it when the pleadings, the discovery and disclosure materials on file, and any affidavits/declarations show that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Miranda v. City of Cornelius*, 429 F.3d 858, 860 n.1 (9th Cir. 2005). As to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

To satisfy its burden at summary judgment, a moving party with the burden of persuasion must establish "beyond controversy every essential element of its [claim or defense]." *S. Cal.*

---

[1] The initial complaint included a cause of action for "entity liability" against the County of Los Angeles and the Los Angeles Sheriff's Department. *See* Complaint ¶ 38, Docket No. 1. That cause of action was dropped from the First Amended Complaint. *See* Docket No. 37.

*Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003); O'Connell & Stevenson, *Rutter Group Prac. Guide: Fed. Civ. Proc. Before Trial* ("*Federal Practice Guide*") § 14:126 (2016); *cf. Robi v. Five Platters, Inc.* 918 F.2d 1439, 1441-42 (9th Cir. 1990) (noting summary judgment is a proper way to establish affirmative defenses, including issue preclusion) (citations omitted). By contrast, a moving party without the burden of persuasion "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), and citing *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000) (holding that the *Celotex* "showing" can be made by "pointing out through argument . . . the absence of evidence to support plaintiff's claim")).

> If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment[, but instead] must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial.

*T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (internal citations and quotation marks omitted) (citing, among other cases, *Celotex*, 477 U.S. at 323).

"A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *See FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009). In addition, the evidence presented by the parties must be admissible. *See* Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Relatedly, "[a]ny objections to declarations or other evidence must be made at or (preferably) before the hearing, and should be ruled upon by the court before ruling on the motion itself." *Federal Practice Guide* § 14:333 (citing *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1335 n.9 (9th Cir. 1980); *Sigler v. American Honda Motor Co.*, 532 F.3d 469, 480 (6th Cir. 2008)). In judging evidence at the summary judgment stage, however, courts do not make credibility determinations or weigh conflicting evidence, and must view all evidence and draw all inferences in the light most favorable to the non-moving party. *See T.W. Elec. Serv.*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in [the non-movant's] favor.").

"If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact – including an item of damages or other relief – that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g); *see also Federal*

*Practice Guide* § 14:352 ("A partial summary judgment may be granted on motion of either party for adjudication of particular claims or defenses.") (citing *id.* § 14:33).

### III. Evidentiary Rulings

Defendants object to certain evidence offered into the record by Plaintiff in his Opposition to the Motion. *See generally* Defendants' Evidentiary Objections ("DEO"), Docket No. 57. On a motion for summary judgment, "[a]dmissibility is determined under the Federal Rules of Evidence." *Federal Practice Guide* § 14:162.2. "An affidavit or declaration used to support or oppose" a summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Federal Practice Guide* § 14:162.

An initial problem with the DEO is that it is not formulated in a manner in which the Court can make the necessary rulings on the objections contained therein. First, the DEO's initial pages contain a delineation of "general procedural and evidentiary rules" − some of which the Court agrees and some of which it disagrees. *See* Docket No. 57 at pages 4-10 of 138. However, while a court is obligated to make rulings on objections to evidence that are material to the motion, it is not required to critique a party's articulation of evidentiary rules. *See Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) ("Before ordering summary judgment in a case, a district court must not only provide the parties with notice and an opportunity to respond to adverse arguments, it must also rule on evidentiary objections that are material to its ruling."). "An objection is material if the court has considered the evidence that is the subject of the objection." *See Federal Practice Guide* § 14:111.2.

Second, in the DEO at pages 9-35 (Docket No. 57 at pages 10-36 of 138), Defendants have placed pages from various declarations of the Plaintiff and his proffered witnesses and ask the Court to make a collective ruling of either "sustained" or "denied" on the included portions of each declaration in totality without further breakdown or specification. This Court will not make overbroad rulings nor will it do the work that counsel should have done – which is isolating relevant portions of a witness's declaration and asking for specific rulings on discrete items of evidence contained therein that are material to the pending motion.[2]

Third, on pages 35-40 of the DEO (Docket No. 57 at pages 36-41 of 138), Defendants object to a section of the Plaintiff's counsel's declaration which attempts to proffer "true and correct" copies of selected portions of transcripts of court proceedings and copies of official reports, because they have not been authenticated and/or are without proper foundation. While the Court agrees that there appears to be such problems as to some of those items, Defendants merely place at the end of that section of the DEO a place to check off "objection sustained as to paragraphs ____" and "objection denied as to paragraphs ____". Such a simplified designation is insufficient.[3] Therefore, if the Court actually considers a particular document objected to by

---

[2] Defendants are also reminded that in judging evidence at the summary judgment stage, courts neither weigh conflicting evidence nor make credibility determinations. *See T.W. Elec. Serv.*, 809 F.2d at 630-31; *see also Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in [the non-movant's] favor.").

[3] For example, Defendants object to Exhibit 11 in Maria Cavalluzzi's Declaration (Docket No. 46-11) which purports to be the "Incident Report" prepared by Vega during the course of his investigation of the alleged crime. The Court has compared Exhibit 11 to the copy of the Incident Report that is attached to Vega's deposition.

3

the Defendants herein, it will make a ruling at that point. *See* footnote 5, *infra*.

In Section VII of the DEO at pages 57-137 (Docket No. 57 at pages 41-138 of 138), Defendants have apparently taken Plaintiff's Response to Defendants' Alleged Uncontroverted Facts (Docket No. 51) and inserted two columns − one which includes Defendant's Objections to Plaintiff's Response and another which adds the words "Sustained ___" and "Overruled ___." There are a number of problems with that methodology. First, there are paragraphs as to which the Plaintiff has not objected to Defendants' factual assertion and yet there is the "Sustained" and "Overruled" designation. *See, e.g.,* Docket No. 57 at page 42 of 138. As to other paragraphs, Defendants have raised as many as ten objections but still with the single "Sustained" and "Overruled" designation such that there is no place for exposition as to which of the objections raised by the Defendants is (or are) being sustained or overruled.

Fouth, there is also an overarching problem with the DEO. Some of the evidentiary objections require further argument and/or presentation in order for the Court to render a proper ruling, which the Defendants have not provided. For example, Defendants have raised the issue of Plaintiff's presenting evidence in his declaration which they contend conflicts with his prior deposition testimony and hence gives rise to the "sham affidavit" rule. This Court would require further presentation from the parties, before being able to rule on the issue.[4]

Finally, as noted above, the Court need not rule on every evidentiary objection that the Defendants have raised, but only on the ones that are material to its decision on the summary judgment motion, where materiality is premised on the court's consideration of the evidence that is the subject of the party's objection. Indeed, a large portion of Defendants' objections are as to matters which are totality immaterial to the present motion. In this regard, the Court would refer

---

They appear to be the same. Thus, Defendants should have informed the Court as to the differences between the two copies or explain why exactly they are objecting to the Court's consideration of Exhibit 11, other than perhaps for the purpose of merely being obstreperous.

[4] The "sham affidavit" rule provides that a party cannot create a material issue of fact by a declaration contradicting his or her own deposition or other sworn testimony. *See generally Cleveland v. Policy Management Systems Corp.*, 526 US 795, 806 (1999) (recognizing, without endorsing, "sham affidavit" holdings in every circuit). However, the rule is applied with caution, and is not applied where a valid explanation or excuse for the contradiction is shown. *See Federal Practice Guide* § 14:166.5. As stated in *Van Asdale v. International Game Technology*, 577 F.3d 989, 998-99 (9th Cir. 2009):

> [W]e have fashioned two important limitations on a district court's discretion to invoke the sham affidavit rule. First, we have made clear that the rule "does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony," *Kennedy*, 952 F.2d at 266-67; rather, "the district court must make a factual determination that the contradiction was actually a 'sham.'" *Id.* at 267. Second, our cases have emphasized that the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit. Thus, "the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition [and] minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit."

*Messick v. Horizon Indus.*, 62 F.3d 1227, 1231 (9th Cir. 1995).

4

the Defendants to footnote 5 herein, *infra.*

## IV. Discussion

### A. Undisputed Facts[5]

Plaintiff alleges that on March 19, 2014, Sylvia Lemus ("Lemus") was a patient at Los Angeles County-USC Hospital. DRO ¶ 1. Lemus reported to two hospital nurses and two nurse supervisors that she was sexually assaulted by a hospital employee. DRO ¶ 2; *see also* Lemus Dep. Tr. at 16:16-19, 108.

After a nurse supervisor contacted law enforcement, Officer Vega arrived at the scene and interviewed Lemus. DRO ¶ 3; *see also* Lemus Dep. Tr. at 12:25, 13:1-3; Vega Dep. Tr. at 71:1-5, 82:16-24. Lemus told Vega that a "thin, young/mid 20s, African-American male hospital employee" who had transported her inside the hospital around the time of her MRI procedure[6] had fondled, fingered, and touched her vagina.[7] DRO ¶¶ 4, 6; *see also* Lemus Dep. Tr. at 14:12-15; Vega Dep. Tr. at 217:6-25, 218:1-4. Vega found Lemus to be "very specific, very coherent, and a very believable victim" and she did not appear to be medicated.[8] Vega Dep. Tr. at 77: 2-4,

---

[5] Some of the underlying "undisputed" facts cited herein have been disputed by Plaintiff or Defendants. The Court has reviewed such disputes and has included in this summary only facts that are supported by the cited evidence, altering the proffered facts if necessary to accurately reflect the uncontroverted evidence. To the extent that any cited underlying "undisputed" fact has been disputed by a party, the Court finds that the stated dispute: (1) fails to actually controvert the proffered "undisputed" fact, (2) disputes the fact on grounds not germane to the statements delineated *infra*, and/or (3) fails to cite evidence in support of the disputing party's position. As such, the Court treats such facts as undisputed. Any proffered facts not included in this ruling were found to be: (1) improper opinions or conclusions rather than facts, (2) were unsupported by admissible evidence, (3) were deemed irrelevant to the Court's present analysis, or (4) some combination thereof.

[6] In her deposition, Lemus testified that prior to the incident, she had been receiving an angiogram when complications developed; the angiogram was stopped and she was taken to get an MRI because of a possible allergic reaction to the dye that was used. *See* Lemus Dep. Tr. at 73-76. She stated that she doesn't recall the hospital personnel who moved her to the location to get the MRI. *Id.* at 76-78.

[7] Lemus told Vega that the person who improperly touched her was "African-American, young, kind of slim." *See e.g.* Lemus Dep. Tr. at 13:18-20. In his initial "Incident Report," Vega describes Plaintiff as follows: "Sex – M, RACE – B . . . HGT. – 5'9' [sic] WGT. – 175 . . . AGE – 25." *See* Docket No. 46-11 at page 2 of 7, which appears to be identical to the report included as Exhibit 11 to Volume I of Vega's May 17, 2017 deposition transcript.

[8] In his deposition, Vega testified that the nurse supervisors had told him that Lemus was "alleging she got sexually assaulted, but she's under some kind of medication." *See* Vega Dep. Tr. at 79:13-15. In her deposition, Lemus stated that at the time she spoke to Vega, she felt coherent and did not feel medicated. *See* Lemus Dep. Tr. at 13:10-19.

At Tekoh's criminal trial, Lemus's treating neurologist (Dr. Gene Sung) testified on direct examination that on March 19, 2014, Lemus had *not* received any medication prior to the angiogram. *See* page 304 of Rpt. Tr. of the July 22, 2015 trial proceedings, attached as Item No. 3 to Plaintiff's Notice of Lodging of Transcripts, Docket No. 66. He also stated that, at an angiogram procedure, a patient may be given a little sedation or anxiety medicine, if needed. *Id.* at 305. On cross examination, he noted that Lemus's medical records indicated that there was a reference, at around 3:00 p.m. on March 19th, to Fentanyl (a narcotic) and Midazolam (an antianxiety drug and sedative), but that there was no evidence that they had been actually ordered or given to her. *Id.* at pages 323-24, 340.

Dr. Sung further testified that, normally, a patient is not given any medication prior to an MRI and, in his review of Lemus's medical records, she was *not* under any medication either before or after the MRI. *Id.* at pages

5

82:23-24, DRO ¶ 5. Plaintiff was not present and does not know what Lemus told the two nurses or Vega about the assault. DRO ¶¶ 37-38; *see also* Tekoh Dep. Tr. at 265:3-5, 112:17-21. Plaintiff does not know who Vega spoke to and what was told to Vega prior to Plaintiff's arrest. DRO ¶ 39; *see also* Tekoh Dep. Tr. at 62:15-18, 142:22-25. Vega testified at his deposition that after initially interviewing Lemus he did not have enough information to arrest an individual for a crime. *See* Vega Dep. Tr. at 118:18 – 119:23.

After interviewing Lemus, Vega went to the nurse supervisors to get the name(s) of the hospital personnel who transported her around the time period when she had alleged that she was sexually assaulted. *Id.* at 111:2-4. The supervisors only gave him one name (*i.e.* Tekoh's). *Id.* at 111:16-20; DRO ¶ 9.

According to Vega, what transpired next was[9]:

> Vega asked the nurse supervisors for assistance in locating Tekoh and they escorted him to Tekoh's work station. Vega Dep. Tr. at 117:4-9. After Tekoh was pointed out to him, Vega noted that Tekoh seemed to fit the description provided by Lemus. DRO ¶ 11. Vega approached Tekoh and after Vega asked him "How's it going . . . . What you do [sic]?", Tekoh appeared to "look[] surprised" and "duck[ing] his head a couple of times." Vega Dep. Tr. at 125:24 − 126:1. At that point, Vega told Tekoh, "You need to tell me the truth of what you did. What happened with Ms. Lemus when you were transporting her?" *Id.* at 126:2-4. Tekoh responded by repeating "I made a mistake." *Id.* at 126:6-7. At that point, Vega decided to detain him, but he was not under arrest. *Id.* at 126:13-25.

> Tekoh indicated to Vega that he wanted to talk to him in private and, because Vega was unfamiliar with that part of the hospital, Tekoh walked him over to a nearby room which Tekoh referred to as a "break room." Vega Dep. Tr. at 127:23 – 128:6, 130:17-18. Vega stated that although the room was windowless, the door was always open during the entire time they were in there. *Id.* at 131:7-25.

> Vega asked Tekoh to write down what had happened as to Lemus; Tekoh began to do so; and Vega walked out of the room to make a phone call to his supervisor Sergeant Dennis Stangeland. *Id.* at 137:17 – 138:19, 143:8-13. Vega stood by the door and after about five minutes, Stangeland arrived. *Id.* at 146:8-23. Vega told Tekoh to stop writing and Vega informed Tekoh that he and Stangeland were going to ask him some questions. *Id.* at 150:19-

---

310, 315. He also stated that in his examination of the medical records as to the MRI, there was no evidence that Lemus was exhibiting any of the symptoms or side effects of the medications that he had previously referenced. *Id.* at page 341.

[9] The succeeding paragraphs are indented, not to indicate that they are part of a quotation or excerpt, but rather to show that they are not necessarily an undisputed delineation of facts; instead, they are the version of events from the relator's perspective, statements and/or testimony.

25. Vega began by referencing Tekoh's statement (*i.e.* that he had made a mistake) and saying "just tell me what happened." *Id.* at 156:11-12. Tekoh then responded that "he had escorted or taken somebody for a procedure. During the procedure, he lifted the sheet, saw her vagina once, didn't do anything. Then after that, he left, came back, then went on to describe what he did and said he spread her legs, touched the outside of her vagina but never penetrated with his finger." *Id.* at 156:14-20.

Stangeland asked Tekoh a few questions. *Id.* at 156:21-25. Then Vega and Stangeland left the room to discuss Tekoh's answers and subsequently Vega made the decision to place Tekoh under arrest. *Id.* at 163:2-8. Vega returned to the room, picked up Tekoh's hand-written confession and asked him to sign it, which he did, whereupon Vega informed him that he was under arrest. *Id.* at 163:9-14.

The handwritten note signed by Plaintiff (the "Confession"), which was attached as Exhibit 3 to Volume II of Vega's deposition transcript, states:

> To whom it may concern,
>
> This is an honest and regrettable apology from me about what happened a few hours ago. I don't know what suddenly came over me, but it was certainly the most weakest [sic] moment I've ever been caught up with in my life. I've never ever found myself doing such a despicable act. I don't think this is an excuse but I'm single – I currently don't have a girlfriend and became very excited after I first saw her vagina accidentally. So after dropping her off, I decided to go further by woking [sic] and spreading her vagina lip for a quick view and then went back to my duty post with the intention of masturbating which I never did.

In his declaration, Tekoh states that[10]:

> At his first encounter with Vega, the officer asked to speak to him in private and was shown to a small reading room nearby. *See* ¶ 15 of Tekoh Declaration, Docket No. 47. While other employees sought to be present during the discussion in that room, Vega told them it was private and closed the door on them. *Id.* Tekoh denies ever having told Vega "I made a mistake." *Id.* ¶ 16. Vega began questioning him without first advising him as to his *Miranda* rights. *Id.* ¶ 17. Among the first questions Vega asked him was whether he was a citizen. *Id.* Suddenly, Vega said "What did you do to the patient?" *Id.* When Tekoh responded he didn't know what Vega was referring to, Vega said the patient that he had transported − adding the "I have you on video abusing a patient by

---

[10] *See* footnote 9, *supra*.

7

the name of Sylvia Lemus." *Id.* Despite his continual denials, Vega kept pressuring Tekoh to confess. *Id.* ¶ 19. Vega continued his verbally aggressive behavior for more than a half an hour, whereupon he sat Tekoh down in a chair, put a piece of paper in front of him, and told him to write down what Vega would dictate to him. *Id.* ¶¶ 20-21. Although he initially refused to do so, Vega applied more coercion (such as using racial epithets like "Mr. Jungle Nigga") and threatening to hand him and his family over to the deportation authorities. *Id.* ¶ 21. Eventually, Tekoh began to write what Vega told him, which was the way the Confession was created. *Id.* ¶ 23.

Defendants Vega and Stangeland had never meet Plaintiff before the incident. DRO ¶ 25; *see also* Tekoh Dep. Tr. at 29:15-17. When Stangeland arrived at the scene, he relied on information relayed to him by Vega.[11] DRO ¶ 14. Stangeland knew of no specifics about Vega's employment as a law enforcement officer that would have led him to believe that Vega was being untruthful or would have engaged in unconstitutional conduct. DRO ¶ 15. Stangeland knew no specifics about Lemus's medical history nor was he informed of any behavior by Lemus that led Stangeland to believe that she was being untruthful about the incident. *See* DRO ¶ 8. At the time Vega began questioning Tekoh in his presence, Stangeland did not believe that Tekoh was under arrest. *See* Stangeland Dep. Tr. at 51:17-19. According to Plaintiff, Stangeland was present for only "about five minutes," DRO ¶ 48, and Stangeland had arrived after he had finished writing out the Confession. *See* Tekoh Decl. at ¶ 24. While Tekoh claims he told Stangeland "I didn't do anything," he never told Stangeland that his Confession was false or that it had purportedly been coerced by Vega. DRO ¶ 18; *see also* Tekoh Dep. Tr. at 139:7-10 (Plaintiff never told Stangeland that Vega had refused to allow him to leave the room). Plaintiff never told Stangeland that Vega had cursed him, used racial epithets, or stepped on his toes. DRO ¶ 19. Stangeland asked Plaintiff if he was attracted to women and he said "yes." DRO ¶ 34. When Stangeland asked him if he became aroused after toughing Lemus, Plaintiff said nothing and shook his head. *Id.* ¶ 33. Neither Vega nor Stangeland ever punched, kicked, tasered or pepper-sprayed Tekoh; Stangeland never touched Tekoh or put his hand on his weapon, nor did Vega in Stangeland's presence. *Id.* ¶¶ 20-21, 35.

Vega made the decision to (and did) arrest Plaintiff. *See* Vega Dep. Tr. 167:15-168:8; Stangeland Dep. Tr. 83:12-20. Afterward, Vega prepared an "Incident Report." *See* Exhibit 7 to Volume II of Vega Dep. Tr. According to the practices at the substation where Vega was working, an officer's probable cause declaration ("PCD") had to be signed by the watch commander at another facility in Downtown Los Angeles. *See* Vega Dep. Tr. at 169:13-23, 202:9-12. Vega submitted the PCD to watch commander Lieutenant Stanley at about 8:30 p.m. on March 19, 2014, which was subsequently approved. *See* Exhibit 13 to Vega Dep. Tr. He thereafter contacted the LASD's Special Victims Unit and spoke to Detective Carlin, gave him a synopsis of what happened, and Carlin told Vega that he would interview Tekoh the next morning after speaking with Lemus. *See* Vega Dep. Tr. at 227:14-17, 232:10-13, 234:12-15, 238:10-12.

---

[11] According to Stangeland, when he initially arrived at the room where Vega and Tekoh were located, Vega told him that Tekoh had admitted to touching the victim's vagina, that Tekoh had said that he wanted to make a statement and that Tekoh was writing it down. *See* Stangeland Dep. Tr. at 28:16-25.

Stangeland prepared a "Supplemental Report" wherein he indicated that: (1) Vega had asked him to be present when he questioned Tekoh; (2) when he went to the location at the hospital, Tekoh was writing at a desk, was told to stop by Vega, and did so; (3) when Vega asked Tekoh what happened with the femal patient, Tekoh admitted touching her underneath her hospital gown after waiting for a doctor to leave her hospital room; and (4) Tekoh answered certain questions asked by Stangeland. *See* Exhibit 12 to Stangeland's Dep. Tr.

After reviewing the evidence, Deputy District Attorney Jane Creighton made the independent prosecutorial decision that there was reasonable suspicion to detain/probable cause to arrest and prosecute Plaintiff. DOR ¶ 59. A preliminary hearing was conducted on September 4, 2014, as to the sufficiency of the evidence to show probable cause to hold Plaintiff over for trial, and Judge Shelly Torrealba held that, based on the testimony of Deputy Vega and Ms. Lemus, there was sufficient probable cause to believe that Tekoh had committed a crime. DRO ¶ 60. During Tekoh's two criminal trials, it was determined by Judges Henry J. Hall and Craig E. Veals that: (1) Tekoh was not "in custody" for purposes of *Miranda* at the time he made his confession; (2) his *Miranda* rights were not violated; and (3) his confession was admissible. DRO ¶ 61.

## B. Applicable Law under 28 U.S.C. § 1983

### 1. *False Arrest*

The absence of probable cause is a necessary element of a § 1983 false arrest claim. *Yousefian v. City of Glendale*, 779 F.3d 1010, 1014 (9th Cir. 2015). Probable cause requires only that those "facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe 'that the suspect has committed . . . an offense.'" *Barry v. Fowler*, 902 F.2d 770, 773 (9th Cir. 1990) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). An officer may not ignore exculpatory evidence that would "negate a finding of probable cause." *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003). However, the mere existence of some evidence that would suggest a defense or non-involvement in the crime will not necessarily negate probable cause. *See, e.g., Yousefian*, 779 F.3d at 1014 (defendant's claim of self-defense to officer in an elder abuse case did not vitiate the existence of probable cause where the officer found the victim's and a witness's version of the events to be more credible).

"Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "[M]ere suspicion, common rumor, or even strong reason to suspect are not enough." *Id*. (quoting *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984)). Taken from the perspective of a person of ordinary prudence, there must be a "fair probability" that the person being arrested has committed an offense. *Beier v. City of Lewiston*, 354 F.3d 1058, 1065 (9th Cir. 2004); *see also Illinois v. Gates*, 462 U.S. 213, 235-236 (1983) ("[O]nly the probability, and not a prima facie showing, of criminal activity, is the standard of probable cause.") (citation and quotations omitted). To defeat summary judgment, therefore, Plaintiff must identify admissible evidence that would be sufficient to permit a reasonable jury to find that Vega (or Stangeland) lacked "reasonable trustworthy information" supporting a "fair probability" that Plaintiff had committed the underlying alleged sexual assault at the time of his arrest. *See Merriman v. Walton*, 856 F.2d 1333, 1335 (9th Cir. 1988); *see also Beier* 354 F.3d at 1065.

9

2. Miranda *Violation*

In *Miranda v. Arizona*, 384 U.S. 436. 444-49 (1966), the Supreme Court held that whenever a criminal suspect is subjected to custodial interrogation, he must be warned of his right to remain silent, informed that any statement he makes can be used against him in court, advise of his right to counsel, and told that, if he cannot afford counsel, one will be appointed for him. The advisal of *Miranda* rights is required when two elements are present: (1) the suspect is in custody, and (2) the suspect is interrogated by law enforcement officers. *See United States v. Bassignani*, 575 F.3d 879, 883 (9th 2009); *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). As observed in *Smith v. Clark*, 804 F.3d 983, 992 (9th Cir. 2015): "In determining whether a suspect is in custody, '[t]wo discrete inquiries are essential.' *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995). First, a court must determine 'what . . . circumstances surround[ed] the interrogation.' *Id*. Second, a court must decide whether 'a reasonable person [in those circumstances would] have felt he or she was not at liberty to terminate the interrogation and leave.' *Id*. 'The custody determination is objective and is not based upon "the subjective views of the officers or the individual being questioned."' *United States v. Bassignani*, 575 F.3d 879, 883 (9th Cir. 2009) . . . ."

The mere failure to advise a suspect of his *Miranda* rights when the circumstances required it does not, by itself, give rise to a § 1983 cause of action. A plurality of the Supreme Court has held that an officer's failure to read *Miranda* warnings to a defendant before interrogation violates only "judicially crafted prophylactic rules" and, for that reason, was not actionable under Section 1983, unless the un-*Mirandized* statements are actually used in a criminal proceeding. *Chavez v. Martinez*, 538 U.S. 760, 772 (2003).

3. *Fabrication of Evidence*

The Fourteenth Amendment prohibits deliberate fabrication of evidence by state officials. *See, e.g.*, *Spencer v. Peters*, 857 F.3d 789, 793 (9th Cir. 2017). To prove a fabrication of evidence claim, a plaintiff must demonstrate that: (1) investigators continued their investigation "despite the fact that [they] knew or should have known that [the plaintiff] was innocent; or (2) [they] used investigative techniques that were so coercive and abusive that [they] knew or should have known those techniques would yield false information." *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc). In this vein, admissible evidence of negligent inaccuracy on part of investigators alone is insufficient to prove a fabrication of evidence claim, *see id.* at 1077; but investigators "who maliciously or recklessly make[] false reports . . . may be . . . liable for damages incurred as a proximate result of those reports," *Blankenhorn v. City of Orange*, 485 F.3d 463, 482 (9th Cir. 2007).

4. *Coercive Interrogation*

Under Ninth Circuit law, plaintiffs may bring challenges to coercive confessions as violations of due process rights under the Fifth and Fourteenth Amendments of the Constitution. *See Crowe v. Cty. Of San Diego*, 608 F.3d 406, 446 (9th Cir. 2010); *Stoot v. City of Everett*, 582 F.3d 910, 927 (9th Cir. 2009). "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is [actionable] under 42 U.S.C. § 1983." *Ricciuti v. New York City*, 124 F.3d 123, 130 (2d Cir. 1997) (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976)). In addition, under the

Fourteenth Amendment, an interrogation is coercive only when, in light of the totality of the circumstances, an officer's tactics are so extreme as to undermine a suspect's ability to exercise free will. *See, e.g.*, *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003) (citation omitted). *Compare Haynes v. Washington*, 373 U.S. 503, 513 (1963) (finding coercive interrogation where suspect held for over five days), *with Clark v. Murphy*, 331 F.3d 1062, 1073 (9th Cir. 2003) (rejecting coercive interrogation claim where suspect interrogated for five hours without water or toilet), *and Cunningham*, 345 F.3d at 810 (rejecting coercive interrogation claim where suspect interrogated for eight hours).

### 5. *Supervisor Liability*

In the context of constitutional violations, supervisors can be held liable if they "knowingly refused to terminate a series of acts by a subordinate that the supervisor knew or reasonably should have known would cause the subordinate to deprive the plaintiff of" his or her constitutional rights, or if "the supervisory defendant knew" the subordinate was "engaging in these acts and knew or reasonably should have known that the subordinate's conduct would deprive the plaintiff of these rights" and the supervisor "failed to act to prevent his subordinate from engaging in such conduct." *See* Ninth Cir. Model Instruction No. 9.4 (Jan. 2012); *cf. Starr v. Baca*, 652 F.3d 1202, 1205-06 (9th Cir. 2011); *Motley v. Parks*, 432 F.3d 1072, 1081 (9th Cir. 2005); *Graves v. City of Coer D'Alene*, 339 F.3d 828, 848 (9th Cir. 2003); *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991). Supervisors may be held liable in their individual capacities for constitutional violations under § 1983 if the supervisor: (1) personally participated in the constitutional violation; (2) directed the violations; or (3) there is a "sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) (citation omitted); *see also Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013) ("To meet this requirement, the plaintiff must show both causation-in-fact and proximate causation.").

**C. Summary Judgment as to Vega**

Defendants move for summary judgment on the grounds that Plaintiff offers no admissible evidence that: (1) Plaintiff was arrested without probable cause (*see* Motion at 13-15; Reply at 5-9; Opp'n at 14-17); (2) Stangeland failed to intervene to prevent Vega's alleged unconstitutional conduct and demonstrated deliberate indifference for supervisor liability (*see* Motion at 15-16; Reply at 12; Opp'n at 12); (3) Defendants deliberately fabricated evidence to cause Plaintiff to be maliciously prosecuted in violation of the Fourteenth Amendment (*see* Motion at 15-16; Reply at 12; Opp'n at 19); (4) Plaintiff was subjected to interrogation while in custody in violation of his *Miranda* rights (*see* Motion at 21-23; Reply at 10-12; Opp'n at 8-10); and (5) Defendants subjected Plaintiff to a coercive custodial interrogation (*see* Motion at 23-25; Reply at 13; Opp'n at 10-14). Defendants also move for summary judgment on the ground that they are entitled to qualified immunity. *See* Motion at 17-20; Opp'n at 19-21.

### 1. *Collateral Estoppel/Res Judicata*

Defendants move for summary judgment on the ground that Plaintiff offers no admissible evidence that he was arrested without probable cause in violation of his civil rights. *See generally* Motion at 13-15; Reply at 5-9; Opp'n at 14-16. As a preliminary matter, Defendants appear to intimate that the issue of probable cause is resolved under the doctrines of res judicata and collateral estoppel because of the finding of probable cause at Plaintiff's preliminary hearing and by the denials of his motions to suppress his Confession at the criminal

11

trials. Defendants, in asserting issue preclusion with respect to the matter of probable cause, bear the burden to set "beyond controversy every essential element of [the defense]." *See Federal Practice Guide* § 14:126; *cf. Robi*, 918 F.2d at 1441-42 (citing *Takahashi v. Board of Trustees of Livingston Union Sch. Dist.*, 783 F.2d 848, 849 (9th Cir. 1986); *Springs v. First Nat'l Bank of Cut Bank*, 835 F.2d 1293, 1295 (9th Cir. 1988)); *Magana v. Commonwealth of the N. Mariana Islands*, 107 F.3d 1436, 1446 (9th Cir. 1997) (noting affirmative defenses may be adjudicated on motion for summary judgment, but finding defense must be raised in answer).

In *Allen v. McCurry*, 449 U.S. 90, 103 (1980), the Supreme Court held that collateral estoppel may apply when § 1983 plaintiffs attempt to relitigate in federal court issues decided against them in state criminal proceedings. Federal courts give a state court judgment the same preclusive effect it would be given under the law of the state in which it was rendered. *See* 28 U.S.C. § 1738; *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 80 (1984). In California, a finding of probable cause to hold a defendant over for trial is a final judgment on the merits because the accused can immediately appeal the determination by filing a motion to set aside the results of the preliminary hearing, and can seek review of the trial court's ruling on the motion to set aside by filing a petition for a writ of prohibition. *See, e.g., McCutchen v. City of Montclair*, 73 Cal. App. 4th 1138, 1146 (1999). However, a finding of probable cause at a preliminary hearing will not collaterally estop a plaintiff from pursuing a later civil rights claim based on the same issue where it is alleged and shown that the arresting officer lied or fabricated the evidence presented at the preliminary hearing and that issue is not raised at the preliminary hearing. *Id.* at 1147; *see also Awabdy v. City of Adelanto*, 368 F.3d 1062, 1168 (9th Cir. 2004); *Harris v. Roderick*, 126 F.3d 1189, 1198 (9th Cir. 1997).

Here, Plaintiff has raised the contention that Vega lied in his testimony at the preliminary hearing as to a number of significant issues − *e.g.* whether: (1) Plaintiff had repeatedly said "I made a mistake," (2) the door to the room was always opened, (3) Vega had placed any undue pressure upon Plaintiff into making the Confession, (4) Vega had dictated and Plaintiff merely wrote down what Vega said, etc. Those matters were not litigated at the preliminary hearing. *See* Rpt. Tr. of Preliminary Hearing, Exhibit 1 to Plaintiff's Notice of Lodging of Transcripts from the Underlying Criminal Case, Docket No. 66. Thus, the exception noted in *McCutchen* is raised in this action, which precludes the automatic application of either the collateral estoppel or res judicata doctrines.

Additionally, in general, suppression rulings under Cal. Penal Code § 1538.5, if followed by a conviction or an acquittal, are final judgments under California law and, therefore, can have collateral estoppel effect in a subsequent civil suit. *See Lombardi v. City of El Cajon*, 117 F.3d 1117, 1121 (9th Cir. 1997); *Ayers v. City of Richmond*, 895 F.2d 1267, 1272 (9th Cir. 1990). However, there is an exception to collateral estoppel when the party against whom preclusion is sought could not, as a matter of law, have obtained review of the suppression ruling in the initial action. *See Lombardi*, 117 F.3d at 1122. In this case, Plaintiff was eventually acquitted by a jury in his second criminal trial. Hence, even though he lost on the suppression motions that he filed, he could not appeal those rulings since he eventually prevailed in the criminal proceedings. Thus, collateral estoppel and res judicata cannot be applied herein from the suppression motions.

2. *Alleged False Arrest, <u>Miranda</u> Violation, Fabrication of Evidence, and Coercive Interrogation by Vega*

Simply stated, summary judgment must be denied as to all of the claims against Vega

12

because there are material issues of fact in dispute.

Vega admitted in his deposition that, after he finished interviewing Lemus, he did not have enough evidence to arrest any individual for a crime. Thus, whether he obtained enough evidence thereafter to establish probable cause depends on what happened when Vega met and discussed the events with Plaintiff. Likewise, the resolution of the issues − as to whether: (1) Vega needed to give Plaintiff any *Miranda* warnings, (2) Vega conducted a coercive interrogation or (3) Vega fabricated false evidence − similarly rests upon a determination of the facts regarding Vega's meeting and questioning the Plaintiff; and those facts are hotly disputed.

It is readily apparent that Vega's version and Plaintiff's version of those events are entirely conflicting. *See* discussion of facts at pages 6-8, *supra*. Thus, summary judgment is precluded as to Vega.

### D. Summary Judgment as to Stangeland

It is clear that most of Plaintiff's claims against Defendant Stangeland fail under the uncontroverted evidence.

First, Stangeland did not subject Plaintiff to any coercive interrogation. Plaintiff himself states that Stangeland was only in the room (where the interrogation took place) for about five minutes just before the interrogation ended. Both Vega and Stangeland stated under oath (and Plaintiff has proffered no contrary evidence) that when Stangeland arrived at the room, Vega told him that Plaintiff had admitted to touching the victim's vagina, that Plaintiff had said that he wanted to make a statement, and that Plaintiff was presently writing it down. Plaintiff also conceded that he never told Stangeland that he was being kept in the room against his will, that the Confession was coerced, that Vega had used improper language such as curses or racial slurs, or that Vega had stepped on his toes or ever touched his weapon. Further, during the period of time Stangeland was in the room, there was no use or threat of force against Plaintiff by either Vega or Stangeland, any overbearing or improper language employed by either officer, or the presence of any other factor that could be found to be coercive.

Second, as to the issue of a *Miranda* warning, there is no evidence of Vega having told Stangeland that he had given that admonition to Plaintiff prior to Stangeland's arrival. Thus, at that time, Stangeland was unaware if in fact Plaintiff had been advised of his *Miranda* rights. However, Vega did tell Stangeland that Plaintiff had already admitted to a crime and was voluntarily writing a statement to that effect. Likewise, there was no indicia that Plaintiff had been placed into custody at that point (*e.g.* Plaintiff did not tell Stangeland that he was being prevented from leaving the room by Vega, etc.). In his deposition testimony, Stangeland stated that: "Given that suspect Tekoh was not in custody, he wouldn't have been Mirandized at that point."[12] *See* Stangeland Dep. Tr. at 63:20-22. Thus, there is no evidence that *Stangeland* violated any law by failing to give Plaintiff the *Miranda* advisal.

---

[12] As noted in *United States v. Basher*, 629 F.3d 1161, 1165 (9th Cir. 2011), an investigatory stop or encounter – sometimes referred to as a *Terry* stop as per the Supreme Court's decision in *Terry v.* Ohio, 392 U.S. 1 (1968) − does not violate the Fourth Amendment if the officer has reasonable suspicion supported by articulable facts (such as a report by a victim of a crime) that criminal activity may be afoot. Where a person is subjected to an investigatory stop based on reasonable suspicion (which is a lower standard than for probable cause), a *Miranda* warning is only required when either the person is placed under arrest or restraints on his freedom of movement to the degree associated with a formal arrest are employed by the officer. *Id.* at 1166; *see also Stanley v. Schriro*, 598 F.3d 612, 618 (9th Cir. 2010).

Third, as Stangeland did not arrest Plaintiff, he is not directly liable for Plaintiff's purported arrest without probable cause.

Fourth, while Stangeland was Vega's supervisor at the time Vega arrested Plaintiff, there is no evidence that Stangeland formally authorized the arrest or that, if he did, he improperly did so. As stated by Vega and not contradicted by Plaintiff, the probable cause declaration was approved by the Lieutenant Stanley, the watch commander at the LASD's downtown facility. Furthermore, even if Stangeland did have some supervisory input as to the Plaintiff's arrest, there is no evidence that (at the time Vega arrested Plaintiff) there was insufficient probable cause to do so. Vega told Stangeland that: (1) Lemus had claimed she was sexually assaulted by a hospital employee who was later identified as Plaintiff, (2) Plaintiff had voluntarily admitted to Vega that he had improperly touched her vagina, and (3) that Plaintiff was writing a statement which detailed his fingering her vagina. When Stangeland entered the room, he observed Plaintiff writing on a piece of paper what was the Confession, and Plaintiff never told him the Confession had been coerced by Vega. It is not disputed that Stangeland had no basis to believe that Vega was being untruthful in his statements or that Vega would have engaged in unconstitutional conduct such as coercing a confession. DRO ¶ 15. Thus, there was sufficient probable cause at the time Vega arrested Plaintiff for Stangeland to believe that said arrest was warranted.[13]

Plaintiff's one remaining claim which the Court would find *survives* the summary judgment motion is his contention that Stangeland falsified evidence in his Supplemental Report. In that report, Stangeland wrote:

> Deputy Vega asked Mr. Tekoh what had happened with the female patient, whom Tekoh had previously transported. Mr Tekoh stated that he had been weak and just "touched her." Deputy Vega asked Mr. Tekoh specifically what he meant when he said he "touched her." Mr. Tekoh admitted that after he had transported a female patient on a gurney from one area of the hospital to another, he raised her hospital gown up above her waist, exposing her naked lower body. Mr. Tekoh said that he had waited for the doctor to leave the female patient's room before he touched the outside of the woman's vagina with his hand.
>
> Deputy Vega asked S/Tekoh how he had placed his hand on the victim's vagina. S/Tekoh described gently placing his right hand over the exterior of the female patient's vagina area and spreading his fingers to expose the interior or the woman's vaginal "lips."
>
> . . . . He claimed that he experienced an erection as a result of his actions; however, he denied that his fingers penetrated her vagina.

*See* Exhibit 13 to Stangeland Dep. Tr. The Supplemental Report was sent along with Vega's

---

[13] It is recognized that Plaintiff claims that while he was interrogated by Vega in Stangeland's presence, he said "I didn't do anything." However, the mere denial of wrongdoing by a suspect does not vitiate the presence of probable cause. *See Yousefian*, 779 F.3d at 1014. Plaintiff's statement that he didn't do anything (without more) does not overcome the victim's accusation, Vega's statement that Plaintiff had already admitted to a crime, and the presence of Plaintiff's written Confession where Plaintiff does not inform Stangeland of his contention that Vega had coerced that confession from him.

Incident Report and other materials to both the Sheriff's Special Victim's Unit (which conducted further investigations into the alleged crime) and to the District Attorney's Office (which prosecuted the case).

Plaintiff denies making any of those statements. This Court cannot make credibility determinations as to that claim. It would simply note that if what he asserts is true, then Stangeland's Supplemental Report would appear to have false information in it.

In sum, the Court would grant summary judgment as to all claims against Stangeland except for the falsified evidence contention.

### E. Qualified Immunity

Defendants also move for summary judgment on the final ground that they are entitled to qualified immunity as a matter of law. *See* Motion at 17-20; Reply at 5-10, 12-13; *see also* Opp'n at 19-21.

Qualified immunity bars suit against an officer when they make decisions that, even if constitutionally deficient, reasonably misapprehend law governing the circumstances the officer faced. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001)); *accord Ford v. City of Yakima*, 706 F.3d 1188, 1192 (9th Cir. 2012) (citation omitted). If facts, viewed in the light most favorable to the plaintiff, demonstrate the defendant violated a "clearly established" constitutional right, the defendant is not entitled to qualified immunity for the underlying constitutional violation. *See Ford v. City of Yakima*, 706 F.3d at 1192 (citation omitted); *see also Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (noting a "clearly established right" is "sufficiently clear that every reasonable official would have understood that what he [was] doing violate[d] that right").

Defendants contend that "Plaintiff has presented no admissible evidence or authority that every reasonable officer would know that their conduct was unlawful in [Defendants'] shoes[.]" Reply at 10; *accord* Motion at 17-20. Critically, to satisfy their burden at summary judgment, Defendants – not Plaintiff – must establish "beyond controversy every essential element of [their defense]." *S. Cal. Gas Co.*, 336 F.3d at 888; *Federal Practice Guide* § 14:126. Defendants offer insufficient evidence to meet this burden as to the claims which this Court has denied above. As delineated in Parts IV-C and D *supra*, genuine disputes of material fact remain with respect to those constitutional claims against Defendants, and those alleged unconstitutional acts (such as false arrest without probable cause, falsification of evidence, coercing confessions, etc.) are so well established that law enforcement officers must be deemed to have knowledge of them.[14] In

---

[14] Moreover, Plaintiff has produced authority for the proposition that "[t]his case is not one where, viewing the record in the light most favorable to Plaintiff, Defendants' conduct did not violate clearly established law." *See generally* Opp'n at 20 − citing *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 2012) (denying qualified immunity for wrongful interrogation, noting "[i]t is bedrock Constitutional law that police officers may not attempt to compel or coerce a suspect into confessing by disregarding his *clearly established* civil rights") (emphasis added), and *California Attorneys for Criminal Justice v. Butts*, 195 F.3d 1039, 1050 (9th Cir. 1999) ("Officers who intentionally violate the rights protected by *Miranda* must expect to have to defend themselves in civil actions."); and at 21 − (citing *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc) (holding there is "a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence . . . deliberately fabricated by the government"), and *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004) (concluding government defendants had fair notice that presenting false evidence before court or prosecutor violated Fourteenth Amendment due process rights).

light of the foregoing, Defendants fail to establish their entitlement to the defense of qualified immunity "beyond controversy."

## V. Conclusion

Based on the foregoing discussion, the Court would deny the Motion for Summary Judgment as to Plaintiff's claims against Vega and as to his claim for falsification of evidence as to Stangeland, and grant it as to his other claims against Stangeland.